IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE DOE,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>LYFT, INC., A California corporation,<br><br>　　　　　　　　Defendant. | Case No. 8:21-cv-401<br><br>**COMPLAINT, JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL** |

JANE DOE, Plaintiff in the above-captioned matter, by and through her counsel of record, testifies as follows:

### PARTIES, JURISDICTION AND VENUE

1.

JANE DOE is a citizen and resident of Omaha, Douglas County, Nebraska at all times relevant to this action. Because this case is about her sexual assault as a passenger in Defendant's product, DOE requests leave to proceed in this case using a pseudonym in documents and hearings available to the public because of the painful and sensitive nature of the claims and evidence in this action.

2.

Defendant Lyft, Inc. is a California corporation registered and licensed to do business in Nebraska. LYFT was licensed to do business in Douglas County as well as across the United States and internationally at all times relevant to this action.

3.

The events at issue occurred in Douglas County, Nebraska. Venue and jurisdiction are

proper in this Court.

4.

This action is brought pursuant to the provisions of 28 U.S.C. §§ 1332. The proper venue for this action is the United States District Court for the District of Nebraska, because the action complained of occurred in Douglas County, Nebraska.

## BACKGROUND: THE LYFT PRODUCT

5.

LYFT markets a Smartphone application product to the public that purports to alleviate the user from the need to drive herself, or find rides, by putting the user in touch with drivers and cars that will transport the user where the user needs to go, at the time the user needs to go, for a fee.

6.

The marketing of LYFT's product is that LYFT's drivers and cars will transport the user or passenger where the user or passenger needs to go, at the time that the user or passenger needs to go, *safely*: don't take chances driving drunk, or lost, or catching a ride with someone you do not know well (or at all), or waiting for a ride in the dark, when you can ride safely with a vetted professional LYFT driver.

7.

LYFT's public representations state that "safety is our top priority," and that "it is our goal to make every ride safe, comfortable and reliable."

8.

LYFT's Smartphone application product is free to download, and is a simple product to use. Every time a user avails herself of LYFT's product to summon a ride, she pays a fee

through that app to LYFT. Those fees are LYFT's principal source of revenue.

9.

LYFT hires drivers via an online application process, without an interview. LYFT hires nearly every applicant, almost completely indiscriminately. It does not even consistently require proof of a valid and current driver's license. Inconsistent with its marketing of "safety is our top priority," LYFT performs only a name-based background check through a third-party vendor; it does not check applicants through biometric fingerprinting or other form of risk assessment.

10.

At the time that LYFT's driver raped JANE DOE, LYFT astonishingly did not have a basic zero-tolerance policy for sexual misconduct. LYFT allowed drivers who had been reported to have committed sexual harassment, stalking and sexual assault to continue driving. LYFT did not adequately investigate complaints of sexually-inappropriate behavior and complaints of serious sexual assaults. As of the date of JANE DOE's rape by a LYFT driver, LYFT was doing nothing to even warn its passengers about this very serious danger, despite LYFT's very real notice and knowledge that sexual predators were using LYFT's product to identify victims.

11.

Once LYFT hires an applicant, LYFT fails to use its own technology (such as GPS tracking) to ensure that its drivers keep in-car cameras activated during the entire ride, and that its drivers remain on-course all the way to the passenger's destination.

12.

Once hired, LYFT drivers use their personal vehicles to provide transportation for users

of LYFT's product. When a user makes a request for a ride through LYFT's Smartphone app, identifying where she would like to be transported, LYFT notifies its drivers that a user has made this request, her location and where she would like to be transported.

13.

LYFT maintains substantial control over its drivers in the performance of their work for LYFT. These controls include but are not limited to:

A. LYFT controls the manner and means by which its drivers offer rides through the app.

B. LYFT logs the start and stop times for a driver's transportation of a user, and observes how much time a driver spends with a particular user.

C. LYFT controls its drivers' conduct with users, the cleanliness of drivers' vehicles, and their timeliness in picking up users and taking them to their destination.

D. Drivers for LYFT must display an emblem on their vehicles openly and publicly designating the vehicle as a LYFT vehicle.

E. LYFT controls what drivers may say and do with users.

F. LYFT grades its drivers on their performance, and retains the right to terminate drivers at will on any or no notice.

G. LYFT retains control over users' contact information.

H. LYFT ostensibly prohibits its drivers from visiting users in person after a ride has been completed.

14.

LYFT sets the fare prices for each ride. LYFT drivers do not collect payment from users. Users pay LYFT only through the app via the user's credit card. LYFT pays the driver a portion of each collected fare, and keeps the remainder.

15.

As early as 2015, LYFT knew that drivers it had approved and authorized to transport LYFT users were sexually assaulting LYFT users. Since 2015, sexual predators driving for LYFT continued to harass, assault, stalk and rape LYFT passengers. Complaints to LYFT by passengers and users attacked by LYFT drivers, coupled with law enforcement investigations that have included warrants served on LYFT, put LYFT on notice that sexual predators were using LYFT's product to find and create victims.

16.

LYFT's response to that notice was to put its corporate head in the metaphoric sand. LYFT continued to hire drivers without performing adequate background checks. LYFT claimed it would only hire drivers who had presented proof of a valid and current driver's license, but hired drivers who could not even present that basic necessity for a driver. LYFT also failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of users and passengers, such as alerts that would activate if a trip lasted far longer than it should given the distance from pickup to requested dropoff.

17.

At all relevant times, LYFT advertised and marketed its services to members of the public in Douglas County, including DOE.

18.

Before the date that a LYFT driver raped JANE DOE, LYFT understood that many assaults occur when LYFT drivers deviate from their route and assault the passenger before reaching her destination. LYFT knew well enough about the pattern of sexual predators using LYFT products to identify victims that it had a duty to modify its product to protect its users and passengers from sexually predatory LYFT drivers.

19.

LYFT also understood that sexual assaults are much less likely to occur if drivers understand from the outset that they are being recorded consistently. As a transportation and technology company with access to an in-app tracking system, as well as a camera within the required mobile device, LYFT could and should have implemented a monitoring system to protect its passengers. But LYFT did not even take the minimal step of training its drivers that sexual assault of passengers would not be tolerated, or of training its drivers that LYFT would fully cooperate with law enforcement against its drivers should a sexual assault be reported (to say nothing of actually making that consistent commitment to fully cooperate with law enforcement).

20.

Nor did LYFT warn users and passengers of the risk that its business model and product puts users and passengers at risk of sexual assault. At the time that LYFT's driver raped JANE DOE, nowhere on LYFT's website or in its app did LYFT address the occurrence or risk of sexual assault by LYFT's drivers. LYFT did not publish any policies or procedures on its website or its app relating to sexual assault. LYFT did not report any statistics on sexual assaults of its passengers by LYFT drivers. LYFT did not train its customer service representatives on how to handle calls from passengers who reported that they had been sexually assaulted by LYFT drivers. LYFT did nothing

to warn its users and passengers that to the exact contrary of what they were expecting by summoning a LYFT ride, they were actually putting themselves at risk of rape by using this product.

21.

Further, LYFT did not train drivers or provide a protocol for the appropriate action if a passenger was so intoxicated that she became unconscious or was unable to state her address or walk from the vehicle. A driver who wanted to help was untrained in whether to take a confused, intoxicated passenger to the hospital or what could be done to avoid leaving that passenger in peril.

### A LYFT DRIVER RAPES JANE DOE

22.

On May 18, 2019, JANE DOE had met friends at a downtown Omaha bar for the evening. She elected to not drive herself, knowing that she could consume alcohol with friends and use rideshare services like LYFT to get home safely.

23.

JANE DOE became intoxicated, and an acquaintance summoned a LYFT driver to take her home. The first LYFT driver did not take JANE DOE all the way to her home, dropping her off at a gas station approximately three minutes away from her home address. She was alone.

24.

A second LYFT driver was summoned. That driver, who went by "Jules," picked up JANE DOE at 0124 hours. He was acting as an agent of LYFT, held himself out as an agent of LYFT, and invited the intoxicated JANE DOE into what he represented as the safety of his vehicle as an agent of LYFT.

25.

Then, the LYFT driver kept JANE DOE in his vehicle for two hours. During those two hours, the

LYFT driver sexually assaulted JANE DOE.

26.

That the LYFT driver sexually assaulted JANE DOE is not disputed: he was charged with sexual assault, tried and convicted.

27.

Through the LYFT app on JANE DOE's smartphone, LYFT billed and collected $26.44 from JANE DOE's credit card, giving some portion to "Jules," for what should have been a 3-minute ride.

28.

The next day, JANE DOE reported to health care providers, and then to law enforcement, that she had been sexually assaulted. The sexual assault was then reported to LYFT. "Jules" was apprehended, and the Douglas County Attorney filed felony sexual assault charges against him. Forensic testing confirmed that the DNA found in JANE DOE's vaginal area during her forensic medical examination came from LYFT's driver.

29.

As a direct and proximate result of LYFT's product, JANE DOE was sexually assaulted by LYFT's driver. As a direct and proximate result of being sexually assaulted by LYFT's driver, JANE DOE underwent invasive and painful physical examinations, and thereafter had to participate in the criminal investigation and prosecution process. JANE DOE incurred expenses for medical and mental health care, and will continue to incur such expenses in the future.

30.

The end result is that LYFT, by treating its passengers as disposable even though it knew sexual predators used LYFT's product to create victims, forever changed the story of JANE DOE's life. She will, forevermore, be a person who was sexually assaulted after using LYFT's

transportation product. There are not two ways around that. She will, forevermore, be someone whom a predator decided he wanted to prey on. She will, forevermore, be someone whom a predator identified as a victim, using LYFT's product and technology to find her and trap her.

31.

And there are not two ways around the fact that LYFT knew it had a product that directly and proximately enabled sexual predators to create victims, yet maintained those predators' access to prospective victims. JANE DOE will always know that LYFT assessed her to be not valuable enough to protect her from the sexual predators that helped LYFT make money.

WHEREFORE, Plaintiff prays for judgment against LYFT, as follows:

A. For compensatory damages (to include damage to JANE DOE's emotional health) in an amount exceeding $75,000, in an amount to be specifically proven at trial;

B. For post-judgment interest at the maximum legal rate;

C. For costs of suit incurred herein;

D. For punitive damages pursuant to California law; and

E. For such other and further relief as the Court deems just and proper.

### JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

JANE DOE requests that this matter be tried to a jury in Omaha, Nebraska.

JANE DOE, Plaintiff,

By: /s/ *Maren Lynn Chaloupka*
Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Law LLC
Post Office Box 1724
Scottsbluff, NE 69363
(308) 270-5091
mlc@chaloupkalaw.net

-AND-

Sean P. Rensch – NSBA # 23031
Rensch & Rensch Law, PC, LLO
John D. Wear Building
7602 Pacific Street, Suite 102
Omaha, NE 68114
sean@renschlawyers.com